FISHER-NEW CENTER COMPANY *v.*
STATE TAX COMMISSION.

OPINION OF THE COURT.

1. TAXATION—ASSESSMENT—REVIEW—HEARING.
   General property tax act since 1899 has provided for a hearing procedure before a State board or agency for review of assessment rolls, and has further provided that action by the board or agency in accordance with the act shall be final (CL 1948, § 211.152, as amended by PA 1964, No 275).

2. SAME—ASSESSMENT—REVIEW—FINALITY RULE.
   Finality rule which prevailed as decisional law before the adoption of the Constitution of 1963 was that judicial review of action by the board or agency reviewing tax assessments in accordance with the general property tax act could not be

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 4, 14, 15, 26]  51 Am Jur, Taxation § 770 *et seq.*
[2, 28]  51 Am Jur, Taxation § 771.
[5, 6, 39, 40]  2 Am Jur 2d, Administrative Law § 565 *et seq.*
[7]  51 Am Jur, Taxation § 773.
[8]  1 Am Jur 2d, Administrative Law § 148 *et seq.*
[9]  51 Am Jur, Taxation § 704.
[10–13, 16–24]  51 Am Jur, Taxation § 701 *et seq.*
[25]  5 Am Jur 2d, Appeal and Error § 1009 *et seq.*
[27, 29–38]  2 Am Jur 2d, Administrative Law § 393 *et seq.*

had except where the action taken was challenged on the grounds of fraud, errors of law, or adoption of wrong principles (Const 1963, art 6, § 28; CL 1948, § 211.152, as amended by PA 1964, No 275).

3. SAME—ASSESSMENT—REVIEW—FINALITY RULE.

Finality rule as to tax assessment review evolved because of the repetition, year after year, of the decision-making process in determining a tax assessment, and because of the need of units of government to be reasonably assured of their tax revenues.

4. SAME—ANNUAL ASSESSMENT.

Decision-making process in setting tax assessments is basically an annual process and subject to change from year to year, quite unlike the usual procedure in judicial matters where, once a case has been tried, decided and accorded appellate review, it becomes a final adjudication.

5. SAME—ASSESSMENT—REVIEW—CONSTITUTIONAL LAW.

Minimum review requirements of decisions of administrative agencies provided for in the Constitution of 1963 *held*, not to apply to review of decisions of any final agency provided for the administration of property tax laws, as to which there is a more limited review (Const 1963, art 6, § 28).

6. SAME—ASSESSMENT—REVIEW—CONSTITUTIONAL LIMITATION.

Constitutional right of appeal from decisions of any final agency provided for the administration of property tax laws *held*, to be restricted to a showing of fraud, error of law, or the adoption of wrong principles (Const 1963, art 6, § 28).

7. SAME—ASSESSMENTS—REVIEW.

Taxpayer's claims for upsetting the valuation assessments of its property, fixed by the State tax commission, will be considered for the restricted purpose of determining whether the commission committed errors of law or adopted wrong principles in its proceedings to determine the assessment, in the absence of a claim of fraud by the taxpayer (Const 1963, art 6, § 28).

8. SAME—ASSESSMENT—TAX COMMISSION REVIEW—DUE PROCESS.

A taxpayer whose assessment is being reviewed by the State tax commission is entitled to be advised as to studies or reports by the staff of the tax commission on which it might base its determination, and must be afforded an opportunity

to challenge the validity of such studies, reports, or findings, and to cross-examine the persons preparing them.

9. SAME—TAX COMMISSION—STAFF REPORT—EVIDENTIARY VALUE.

Staff report to State tax commission recommending an assessment based almost entirely on capitalization of income method for real property, made by a staff investigator who admitted on cross-examination that he was not an expert on the capitalization of income method, *held,* not without any evidentiary value whatsoever, where the appraisal itself is a part of the record, and the staff investigator exhibited a familiarity with the appraisal procedures and the use of appraisal manuals.

10. SAME—TRUE CASH VALUE—METHODS—DECISION MAKING.

All methods used to determine true cash value of real property for purposes of taxation involve the exercise of judgment or decision making.

11. SAME—TRUE CASH VALUE—SALE.

A sale which has occurred does not necessarily determine true cash value of property by definitely fixing the market price, particularly if the property is unique and if there have been few sales.

12. SAME—TRUE CASH VALUE—SALES PRICE.

Sales price, particularly a single sales price, is only 1 index of true cash value to be used in determining the assessment of real property for tax purposes, and is not by itself controlling.

13. SAME—TRUE CASH VALUE—METHODS—DECISION BY ASSESSOR.

True cash value for purposes of tax assessment should be based upon one or more of the recognized methods for its determination, and the method or methods to be used is a matter for decision at the assessing level which, if supported by the record, will not be subject to judicial review.

14. SAME—TRUE CASH VALUE—METHOD—ADMINISTRATIVE DECISION —REVIEW.

Three levels of determination—(1) by the assessor, (2) by the board of review, and (3) by the State tax commission—must suffice for the assessment decision for the determination of true cash value of property for tax assessment purposes, in the absence of fraud, error of law, or the adoption of wrong principles (Const 1963, art 6, § 28).

15. SAME—ASSESSMENT—REVIEW—ERROR OF LAW—APPLICATION OF WRONG PRINCIPLES.

Errors of law or the application of wrong principles in determining true cash value of taxpayer's property *held*, not demonstrated by taxpayer, where State tax commission determination, showing substantially similar true cash values derived by several recognized methods of appraisal, is supported by the record (Const 1963, art 6, § 28).

16. SAME—TRUE CASH VALUE—STATE TAX COMMISSION—RECORD.

Determination by State tax commission that the true cash value of taxpayer's property is $19,558,348 *held*, supported by the record, in a case where the reproduction cost method, after adjustment for ornate construction and allowance for depreciation and obsolescence, gave such a value; the capitalization of income method, using a capitalization factor of 8.1% applied to the actual net income before taxes for 1 year, gave a value of approximately $18,850,000; the same method, using the same capitalization factor applied to taxpayer's expert's estimated stabilized net income before taxes, gave a value of $20,043,210; and multiplication of actual gross income for each of 2 successive years by a multiplier of 5.6, within the range of multipliers of 4 to 6 for old office buildings found in an appraisal manual, gave true cash values of $20,160,000 for 1 year and $19,600,000 for the other year.

17. SAME—STATE TAX COMMISSION—ERROR OF LAW—EVIDENCE.

A decision of the State tax commission that the average assessment level in the city of Detroit is at 50% of true cash value, based upon studies of the commission which were not contained in taxpayer-appellant's appendix nor in the records certified to the court, not identified on the record at the hearing before the commission, nor printed as a separate appendix by the commission for the purpose of exhibiting the studies to the court, would be unsupported by any evidence and hence would oblige the court to hold that the commission committed an error of law, if there were no other evidence before the court to support the 50% average assessment level.

18. SAME—STATE TAX COMMISSION—STUDIES—RECORD.

Better practice upon appeal to the Supreme Court from a decision of the State tax commission based on studies made by the commission would be to include the studies of the

commission as a part of the record for consideration by the Court, or if such studies are too bulky, extraction and certification of pertinent portions of the studies, or stipulation by the parties as to their contents.

19. SAME—STATE TAX COMMISSION—COMMISSION STUDIES—RECORD.
Taxpayer appealing from a decision of the State tax commission based on studies made by the staff of the commission has the initial responsibility to include the studies of the commission as a part of the record for consideration by the court, and if the taxpayer fails to do so, the commission has the responsibility for providing the same.

20. SAME—STATE TAX COMMISSION—COMMISSION STUDIES—RECORD.
Decision of State tax commission that assessment level in the city of Detroit was at 50% of true cash value, based in fact upon studies made by the commission staff but not made part of the record on appeal, *held,* supported by other evidence in the record, where the record shows that several of the witnesses cross-examined by taxpayer's attorney explicitly mentioned the *50%* assessment level as being used in their computations, and where the taxpayer elected to offer competing evidence of a lower assessment level rather than attempting to impeach the 50% level assumed in the commission staff report and indicated by the witnesses.

21. SAME—VALUATION—ULTIMATE GOAL.
The single ultimate goal of valuation performed by tax assessors is to attain uniform true cash values.

22. SAME—UNIFORM ASSESSMENT.
A uniform approach to valuation does not always result in uniform assessment.

23. SAME—REPRODUCTION COST METHOD—UNIFORM ASSESSMENT.
Use of the reproduction or replacement cost less depreciation and obsolescence method of property valuation, because the percentage of depreciation and of obsolescence to be used is a matter of judgment, is not an assured method of achieving a uniform assessment.

24. SAME—TRUE CASH VALUE—VALUATION METHODS.
Valuations of property for assessment purposes are more likely to reflect true cash values when all approaches to valuation are available for use in comparison of results, and the use of the method of reproduction cost less depreciation and

obsolescence, while permissible, should not foreclose other methods and approaches, depending upon the nature of the particular property, to achieve uniform assessment.

25. COSTS—TAXATION—ASSESSMENT—RECORD.

No costs are allowed on appeal from order of State tax commission to Supreme Court upon affirmance of commission's order relative to assessment on property, where neither party has provided the Court with an adequate record to support the determination under review.

DISSENTING OPINION.

DETHMERS, C. J., and SOURIS and O'HARA, JJ.

26. ADMINISTRATIVE LAW AND PROCEDURE—TAXATION—ASSESSMENT —REVIEW.

*Proceedings of State tax commission are subject to same scope of judicial review as provided by the administrative procedures act for other administrative agencies (CLS 1961, § 24.101).*

27. SAME—DECISION—EVIDENCE.

*Agency findings, inferences, conclusions, or decisions must be supported by competent, material, and substantial evidence (CLS 1961, § 24.101[3][e]).*

28. TAXATION—ASSESSMENT—REVIEW—CONSTITUTIONAL LAW.

*No appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decisions relating to valuation or allocation, in the absence of fraud, error of law, or the adoption of wrong principles (Const 1963, art 6, § 28).*

29. SAME—EVIDENCE—REVIEW.

*Sufficiency of evidence in hearing before State tax commission is a question of law appropriate to reviewing court's consideration even when review is by certiorari and limited to questions of law.*

30. APPEAL AND ERROR—EVIDENCE.

*Reviewing court considers evidence to determine, as a matter of law, whether it supports, by the standard set by law, the facts found by the tribunal whose action is being reviewed.*

31. SAME—STATUTES—APPEAL FROM ADMINISTRATIVE AGENCY—EVIDENCE.

*Statute which limits appeals from administrative agency's decision to circuit court to questions of law does not preclude*

*consideration of evidence on review for errors of law to determine whether the record contained any competent evidence to support the facts found by the agency.*

32. ADMINISTRATIVE LAW AND PROCEDURE—DUE PROCESS—EVIDENCE.

*Due process requires at least that record of administrative agency decisions reviewed for errors of laws must disclose competent evidence to support the findings of fact on which the decisions were based.*

33. SAME—STATUTES—ADMINISTRATIVE PROCEDURES ACT—SCOPE OF REVIEW.

*Scope of judicial review provided by the administrative procedures act for administrative decisions limits reversal or modification of decisions to situations where substantial rights of the petitioner may have been prejudiced because the administrative findings, inferences, conclusions or decisions (1) are in violation of constitutional provisions, (2) are in excess of the statutory authority or jurisdiction of the agency, (3) are made upon unlawful procedure, (4) are affected by other error of law, (5) are unsupported by competent, material, and substantial evidence in view of the entire record as submitted, or contrary to the overwhelming weight of the evidence, or (6) are arbitrary or capricious (CLS 1961, § 24.108).*

34. EVIDENCE—OPINION—ADMISSIBILITY.

*Opinions or conclusions normally are not considered competent evidence unless they relate to matters beyond the ken of the fact finder, unless they are offered in the form of the opinion of an expert, and unless the factual basis for the expert's opinion is supported in all essential respects by some evidence.*

35. TAXATION—TAX COMMISSION—STAFF REPORT—EVIDENTIARY SUPPORT.

*Staff report to State tax commission recommending an assessment based almost entirely on capitalization of income method for real property, made by staff investigator who admitted he was not an expert on the capitalization of income method and that the report was based upon assumed facts essential to its conclusion, for which there is no evidentiary support in the record, is an opinion or judgment which should not be considered competent evidence.*

36. SAME—TAX COMMISSION—ADOPTION OF STAFF REPORT—EVIDENCE.

Adoption by State tax commission of assessment by staff investigator who used a 5.5% rate of return as base rate for capitalizing earnings to determine value of property when he admitted the rate did not represent the average rate of return expected, that he knew of no sale of investment real estate made on the basis of 5.5% rate of return, and that it represented the average expected in a prime return situation where there is little risk involved, was improper, where the only evidence in the record of rate of return a prudent real estate investor would expect came from an expert who compared investments in the area and put the rate between 8.8% and 10.7%.

37. SAME—ADMINISTRATIVE HEARING—RECORD.

Administrative finding affecting the property valuation of a taxpayer must be based upon studies that are part of the record of the State tax commission's hearing.

38. SAME—TAX COMMISSION—REPORT—EVIDENCE—BURDEN.

Burden is upon State tax commission to introduce its report and supporting evidence when the report is in conflict with tax contentions of either of the principal contestants.

SEPARATE OPINION.

BLACK, J.

39. TAXATION—ASSESSMENT—REVIEW—CONSTITUTIONAL LAW.

Minimum requirements of review of final decisions, findings, rulings, and orders of any administrative officer or agency does not apply to review of decisions of any final agency provided for the administration of property tax laws (Const 1963, art 6, § 28).

40. SAME—ASSESSMENT—REVIEW—CONSTITUTIONAL LIMITATION.

Constitution provides that in absence of fraud, error of law, or adoption of wrong principles no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation (Const 1963, art 6, § 28).

Appeal from State Tax Commission. Submitted June 7, 1967. (Calendar No. 4, Docket No. 51,603.) Decided April 1, 1968. Rehearing granted May 6, 1968. See 381 Mich 713.

Fisher-New Center Company, a Michigan corporation, taxpayer, appealed its property tax assessments by defendant City of Detroit for the years 1963, 1964, and 1965 to the State Tax Commission. Order entered by State Tax Commission fixing the assessment of Fisher-New Center Company property. Taxpayer appealed to the Court of Appeals, and the City of Detroit cross-appealed, both by leave granted. Taxpayer appeals, and City of Detroit cross-appeals to the Supreme Court by leave granted before decision by Court of Appeals, pursuant to GCR 1963, 852. Decision of State Tax Commission affirmed as to both appeal and cross-appeal.

*Honigman, Miller, Schwartz & Cohn,* and *David M. Miro* (*John Sklar,* of counsel), for Fisher-New Center Company.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *T. Carl Holbrook* and *Richard R. Roesch,* Assistant Attorneys General, for State Tax Commission.

*Robert Reese,* Corporation Counsel, and *John H. Witherspoon* and *Julius C. Pliskow,* Assistant Corporation Counsel, for City of Detroit.

ADAMS, J. On January 6, 1964, appellant's property in Detroit, known as the Fisher-New Center Complex, was valued at $9,779,170 by the State tax commission. Detroit had assessed the property at $13,241,460 for 1963. While appeal by the city was pending, we remanded to the commission for further hearing. *In re Fisher-New Center Company* (1965), 375 Mich 559. By stipulation of the parties, the new hearing also covered 1964 and 1965 assessments. The commission reaffirmed its order of Jan-

uary 6, 1964, found the true cash value of the property to be $19,558,348, the general level of property assessments in Detroit to be at 50% of true cash value, and the proper assessment to be $9,779,170. The case is now here upon grant of petition to bypass the Court of Appeals.

## I. SCOPE OF REVIEW.

Basic to decision in this case is a determination of the extent and nature of judicial review of final board or agency decisions relating to valuation or allocation for spreading of property taxes.

Since 1899, section 152[1] of the general property tax act (CL 1948, § 211.1 *et seq.* [Stat Ann 1960 Rev § 7.1 *et seq.*]) has provided for a hearing procedure before a State board or agency,[2] or a member thereof, for review of assessment rolls to determine whether any property subject to taxation has been omitted or individual assessments have not been made in compliance with law. Throughout its existence, section 152 has provided that action by the board or agency, or a member, in accordance with the act shall be final. This Court has held that it was foreclosed from judicial review except where the action taken was challenged on the grounds of fraud, errors of law, or adoption of wrong principles. This doctrine has been described as the "finality rule." *Newport Mining Co.* v. *City of Ironwood* (1915), 185 Mich 668, 685; *Moran* v. *Grosse Pointe Township*

[1] Section 152 was added by PA 1899, No 154. It appears in CL 1948 as § 211.152 and has been subsequently amended as to the language pertinent here by PA 1955, No 223 and PA 1964, No 275 (Stat Ann 1960 Rev and Stat Ann 1965 Cum Supp § 7.210).

[2] PA 1899, No 154, created the board of State tax commissioners which was succeeded in 1925 by the State tax department established by PA 1925, No 155, and, in turn, abolished in 1927 with powers and duties transferred to the present State tax commission, created by PA 1927, No 360 (CL 1948, § 209.152 and § 209.103, respectively [Stat Ann 1960 Rev § 7.621 and § 7.633]).

(1947), 317 Mich 248; *Kingsford Chemical Company
v. City of Kingsford* (1956), 347 Mich 91; *Pavilion
Apartments, Inc., v. State Tax Commission* (1964),
373 Mich 601.

It is the contention of appellant, however, that
because of the provisions of Const 1963, art 6, § 28,
the scope of judicial review of an order of the State
tax commission has been broadened.

Article 6 of the 1963 Michigan Constitution relates
to the judicial branch. Its section 28 reads:

"All final decisions, findings, rulings and orders
of any administrative officer or agency existing un-
der the constitution or by law, which are judicial or
quasi-judicial and affect private rights or licenses,
shall be subject to direct review by the courts as pro-
vided by law. This review shall include, as a mini-
mum, the determination whether such final decisions,
findings, rulings and orders are authorized by law;
and, in cases in which a hearing is required, whether
the same are supported by competent, material and
substantial evidence on the whole record. Findings
of fact in workmen's compensation proceedings shall
be conclusive in the absence of fraud unless other-
wise provided by law.

"*In the absence of fraud, error of law or the adop-
tion of wrong principles, no appeal may be taken to
any court from any final agency provided for the
administration of property tax laws from any deci-
sion relating to valuation or allocation.*" (Emphasis
supplied.)

Appellant contends article 6, § 28, incorporates as
a constitutional requirement the law as it had been
developed by prior decisions of this Court; that, by
the Constitution, the courts are authorized to review
actions of all agencies, including the State tax com-
mission; that section 28 grants direct judicial review
to determine as a minimum whether administrative
findings are supported by competent, material and

substantial evidence on the whole record; that, in valuation cases, the scope of such review is expressly limited to a determination of whether the agency decision is based on fraud, error of law, or the adoption of wrong principles; and that a valuation decision by the State tax commission which is unsupported by competent, material and substantial evidence on the whole record is an error of law and an adoption of wrong principles. By this argument appellant seeks to avoid the limiting provisions of the second paragraph of article 6, § 28.

Valuations of property for tax purposes are first set by an assessor or a board of assessors acting for local governmental units. Such assessments are then reviewed by a local board of review where any taxpayer may appear to protest the assessor's valuation. If the taxpayer is dissatisfied with the decision of the board of review, he may appeal to the State tax commission.

Decisions by the local assessor or the board of review have finality only for the year in question. Even a determination by the State tax commission has finality for a period of not to exceed three years. CL 1948, § 211.152, as last amended by PA 1964, No 275 (Stat Ann 1965 Cum Supp § 7.210). The decision-making process, basically an annual one and subject to change from year to year, is quite unlike the usual procedure in judicial matters where, once a case has been tried, decided, and accorded appellate review, it becomes a final adjudication. Because of the repetition, year after year, of the decision-making process, and because of the need of units of government to be reasonably assured of their tax revenues, the finality rule evolved.

The delegates to the constitutional convention for the 1963 Michigan Constitution were aware of this

situation as is revealed by their debates.[3] Consequently, when it was desired to spell out in the new Constitution rights of review of administrative decisions, the convention was careful to provide an exception to such rights in connection with appeals from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation. Appellant attempts to impose the minimum review requirements in the first paragraph of article 6, § 28, upon appeals permissible under the last paragraph. We do not so construe the section. The last paragraph was clearly

---

[3] Section 28 of article 6, Constitution of 1963, originated in the constitutional convention as committee proposal 95. 1 Official Record, Constitutional Convention 1961, p 1440. What is now the last paragraph of this section did not appear in the original text. It was proposed as an amendment at the time that the complete revision of the proposed new Constitution was being considered by the convention on third reading. 2 Official Record, p 3136. At the time the amendment was offered in convention, Delegate Brake, one of its co-authors, gave the following explanation: "If we are to permit any taxpayer who is not satisfied with the decision of the State tax commission as to the value of his property to go into court, we are going to need more courts. It has always been the fixed policy that a court will never substitute its judgment on the value of property for the judgment of the assessor. In order to get into court we have had to be able to show fraud or bad faith or that the assessment was illegal. * * * It just simply won't work to allow an appeal to court, when no fraud is involved, from a decision on the basis of what is the value of certain property." 2 Official Record, p 3136. At that time, the proposed amendment was defeated. 2 Official Record, p 3138. It was again proposed three days later in a revised form. 2 Official Record, p 3240. On this occasion, Delegate Brake said: "Never, never in the world can we have a judge substitute his opinion for the opinion of the assessors and have tax machinery that you can live with. Now, when there is a matter of bad faith, when there is a matter of fraud, an illegal tax, the remedy in the court is ready any time. You always can get in court on those things." Speaking to the same amendment, Delegate Allen, also a co-author, said: "All we're trying to do in this is to say that on State tax commission matters we preserve all the rights that already exist but we are not going to go further and allow the court to substitute its judgment and become an assessor." 2 Official Record, p 3241. The amendment was adopted. 2 Official Record, p 3242. The amendment was reworded by the committee on style and drafting of the constitutional convention. 2 Official Record, p 3292. The language of the amendment as recommended to the convention by the committee on style and drafting was adopted. 2 Official Record, p 3293.

intended to provide a more limited review in property tax matters than is provided for in the first paragraph. Appeals under the last paragraph are restricted to a showing of fraud, error of law, or the adoption of wrong principles.

We granted review here in order that the nature and extent of judicial review might be considered in the light of the provisions of the 1963 Michigan Constitution and because of taxpayer's claims that the State tax commission committed errors of law and adopted wrong principles in arriving at its decision. In the light of our above holding, much of taxpayer's argument loses effectiveness because predicated on an interpretation of article 6, § 28, which this Court does not accept. Taxpayer's claims for upsetting the valuation assessments of its property, fixed by the State tax commission, will be considered for the restricted purpose of determining whether the commission committed errors of law or adopted wrong principles. No fraud is claimed by taxpayer.

## II. THE HEARING.

In *Pavilion Apartments, Inc.,* v. *State Tax Commission, supra,* it was determined that a taxpayer is entitled to be advised as to studies or reports by the staff of the State tax commission upon which that commission might base its determination. The taxpayer must be afforded an opportunity to challenge the validity of such studies, reports or findings, and to cross-examine the persons preparing the same. We remanded this case to the commission for further hearing in the light of *Pavilion.* Such hearing was held. The commission, in its decision, states that it "made available every shred of data and evidence contained in its records to both taxpayer and taxing authority." The adequacy of the hearing is now undisputed. However, it is claimed that, as a

result of the evidence produced at the hearing, the decision of the commission was erroneous: (1) because there is no evidence to support its decision, or (2) because the decision is against the great weight of the evidence and in disregard of the only competent evidence.

The hearing was opened by the taxpayer. Witness Louis Berry, president of Fisher-New Center Company, testified that the assessed properties were purchased on December 7, 1962, for $10,000,000. The factor used to determine the purchase price was return on investment.

William R. Luedders, a specialist in appraisals of nonresidential properties, testified that with certain adjustments in the sales price it finally amounted to $9,238,585. In his opinion, there are three standard approaches to value:

"Replacement value after allowances for depreciation and obsolescence which furnishes an upper limit of value. Comparable sales, and capitalization of income which may be based on the capitalization method disclosed—or capitalization levels disclosed by the comparable sales."

Based upon a capitalization of income method, he arrived at a fair cash market value for 1963 of $9,800,000 and for 1965 of $10,000,000.

Elof Nordbeck, a member of the staff of the tax commission, was called for cross-examination by the taxpayer. Nordbeck was in charge of the staff that investigated assessments in Detroit and Wayne county for the year 1963 for the purpose of making recommendations for equalizing valuations. He testified that the studies for such a determination are a continual process and that the data from which the studies were made were part of his files. He stated that the normal level of assessments in Wayne

county for that year was 50% of true cash value. He testified further that assessments in Detroit varied in percentage and relation to true cash value in a range from 38 to 52% with the bulk of residential real estate at an average of 43%.

The taxpayer also submitted to the commission certain exhibits and documentary evidence to support its claim that the general level of assessments was 42.7%. Due to the fact that two of the tax commissioners would not be present for the balance of the hearing, the attorney for the taxpayer then made a closing statement in which it was claimed that the use by the city of a reproduction cost method of determining value was improper and should not have been used by the city assessors in determining fair market value; that the proper assessment level in Detroit was 42.7% and that, consequently, the assessed value of the property should be determined to be between $4,300,000 and $4,400,000.

In a statement made at the same time, the attorney for the city stated the capitalization of income approach is not used by the board of assessors to arrive at assessments because 95% of all industrial property and 85% of all residential property is owner-occupied. There is no income to judge what would be a proper assessment based on capitalization of income. The primary approach used by the city is reproduction cost less depreciation, consideration being given to sales and income as a test to measure the grant of obsolescence where warranted.

The hearing resumed the following day. Robert Case, city assessor for Dearborn Heights who had previously been a property appraiser for the tax commission, was cross-examined by the attorney for Detroit. He testified he had been an investigator doing field work in the development of appraisals of property and that he, with another appraiser for the commission, had done the field work in connec-

tion with the Fisher-New Center properties. The appraisal sheets, at the insistence of Tax Commissioner Barr who was conducting the hearing, were made a part of the record. Case testified in great detail as to the procedures which were followed to determine the value of the buildings and the real estate. He was cross-examined by the attorneys for the city and the taxpayer. Values had been calculated both by projecting the income of the property and on a reproduction cost basis. Using the latter method, an allowance of 50% was given for obsolescence "to bring our appraisal down to the value that we arrived at from projecting the income of the property." Case testified under cross-examination:

"*Q.* In fact your approach—you relied entirely on the income approach, did you not?
"*A.* I would say almost entirely."

It is the taxpayer's contention that, because Case stated he was not an expert on the capitalization of income method, the entire probative value of the appraisal by the staff of the commission was destroyed. The appraisal itself is a part of the record. Case, though unwilling to denominate himself as an expert in a particular phase of appraisal work, exhibited a familiarity with appraisal procedures and the use of appraisal manuals. Consequently, we do not conclude that the staff's report to the commission is without any evidentiary value whatsoever.

John W. Libcke, a member of the board of assessors of the city of Detroit, testified as to the procedures followed by that board. There are 420,000 parcels of real estate in Detroit to be assessed and more than 65,000 individual personal property assessments to be made. Real property appraisals are made by a staff of 60 appraisers and presented to the board of assessors, pursuant to policy determinations and procedures outlined by the board. The

board of assessors established building cost schedules which they considered to reflect the true cash value of property when applied with other factors involved in the assessment process. Building cost schedules are tested by sales to determine the validity of the schedules. Libcke stated it would be proper to utilize the income approach in determining the true cash value of property but, basically, the city uses the reproduction cost method. He testified that the known cost of a particular building would have no relevancy under the reproduction cost method of assessment used by the city but that such a building would be assessed on the basis of average costs for a building of the type involved, such average costs being determined from the building cost schedules.

George Turner, an employee attached to the land division of the board of assessors, testified with regard to the city's procedures for the valuation of real estate. He stated that in assessing the value of land he was concerned with more than the value of the one piece of property involved. He said assessors must always keep in mind how their valuation of a parcel relates to the next block and the next block thereafter, and so to the whole city. This is the assessor's primary function. When asked for his opinion as to the average level of property assessments, real and personal, to cash value in 1963, 1964 or 1965, he replied:

"I would say in the downtown area the newer buildings would be assessed at close to 50%, the older buildings—there is so much obsolescence and if you went by the sales of these properties our assessments could be 100% of the sale price in many cases more."

Henry K. Thomas, head appraiser of the major building division for the Detroit board of assessors,

testified with regard to the assessment of the Fisher-New Center properties. The normal procedure used by that board for appraising property would be to take the comparative replacement rate and depreciate for the age of the structure in conformity with its rules and procedures. A comparative replacement rate is used instead of a reproduction rate to remove excess cost for over-decoration and over-design. The next operation is an analysis for obsolescence. The basic approach utilized in determining the building assessment is on the comparative replacement cost, less allowances for depreciation, less obsolescence. The city also makes a study of comparative sales to determine obsolescence considerations. Thomas stated that the city does not base any assessments solely on an income approach or on a sales approach but, rather, does them on an appraisal of cost less depreciation. Upon cross-examination, he was asked:

"*Q.* Are you now satisfied to state that in your opinion you are not competent to make a capitalization of income approach of this property?
"*A.* Yes. * * *
"*Q.* You have testified that you did not seek to arrive at true cash value of this property, the Fisher-New Center Complex, isn't that right? You have already testified to that?
"*A.* Yes."

It is clear from the testimony of the city's witnesses and exhibits that the policies, procedures, and method of assessment established by the Detroit board of assessors sought as its primary objective to attain uniformity within and between properties rather than true cash values.

At the conclusion of the hearing, Commissioner Barr raised the question as to what would constitute the file in this case. He said:

"The complaint of the taxpayer must remain there, all our work sheets and our appraisal data and reports of our staff must be considered a part of the file."

In an exchange with the attorney for the city, Commissioner Barr said:

"If you are saying that we are not going to be permitted to use this material in determining these assessments, to make use of the material that we have accumulated through our staff, then we will have to meet again and lay it out for you because I am not going to agree on this record that we are going to be so restricted that we can't make use of the knowledge that we have accumulated in our work."

Finally, Commissioner Barr stated:

"Well, at any rate we have the new record, but it is not limited."

The decision and order of the State tax commission filed December 2, 1965, reads in part as follows:

"In this, and as in every other assessment appeal, the State tax commission is faced with (a) determining the true cash value of property and (b) the proportion of true cash value at which its assessment should be placed.

"The taxpayer contends in essence that its recent purchase of the properties for $10,000,000 establishes its true cash value; and that it should consequently be assessed at approximately $4,270,000 since the work data of county and State equalization indicates an assessment level of 42.7% of true cash value for the city of Detroit.   *   *   *

"The city of Detroit has not chosen to justify the assessment of $13,241,460[4] but has instead urged the

---

[4] The total recommended assessment for the Fisher Building made by the Detroit board of assessors in 1963 was $6,772,660. This was increased by the Detroit board of review to $7,466,110 by

figure of $12,548,010 as being the proper assessment
figure for the properties which consist of 29 descriptions comprising the Fisher Building, the New
Center Building, and surrounding parking locations.
The city maintains that it has consistently assessed
properties by consideration of its cost less depreciation and obsolescence, that it assesses all properties
in such manner and that therefore the Fisher-New
Center properties must necessarily be assessed their
proper tax burden. The commission rejects such
contention based upon its long experience as well
as the constant judicial pronouncements of the Michigan Supreme Court. Such experience and judicial
decisions establish that uniform approach to valuation does not always result in uniform assessment.

"Although the commission is aware of the purchase price of the properties in the amount of
$10,000,000 it cannot conclude therefrom that the
purchase price is representative of the properties
true cash value. An isolated sale of property is not
evidence of its true cash value especially where the
property is singular in character and quality. * * *

"The commission is not impressed with the appraisal presented by the taxpayer to support a market value of $10,000,000. The actual income and expense figures for the years 1961 and 1962 were submitted to the commission and thoroughly analyzed
by its staff. A reasonable capitalization factor applied thereto assigns an aggregate value of $19,558,-
348 to the 29 items of property. Such valuation
by an income approach is substantiated by a reproduction cost approach to the property.

"The taxpayer's contention that 42.7% of true cash
value constitutes the assessment level of all properties in the city of Detroit is based exclusively upon
the work of Wayne county equalization upon which
is superimposed State equalization. Acceptance of

the addition of $693,450 resulting from the rejection of a 15%
obsolescence allowance on the office portion recommended by the
assessor "to better equate the net rentable area with the cube."
(Footnote supplied; not a part of quoted text.)

such percentage would presuppose perfect intra-county equalization which in fact is unattainable. State tax commission studies of real property indicate that real property in the city of Detroit was assessed in a significant range of 38–52% of its true cash value as of the tax days in question. Studies of personal property assessment levels indicate that personalty was assessed at approximately 56% of its true cash value. The assessment level of all property, real and personal, in the city of Detroit for the tax years in question has been determined to approximate one-half or 50% of its true cash value. Thus, the tax commission has determined all assessment appeals during the years in question by application of 50% to the true cash value of the property.

"It should be stressed that the taxpayer's sole reliance upon a so-called 'equalization factor' of 42.7% is misplaced. It presumes perfect intracounty equalization. This is not the fact in any county within the State. * * *

"The State tax commission finds that the 29 items of property contained in the appeal of Fisher-New Center Company had a true cash value as of December 31, 1962 of $19,558,348; that the proportion of true cash value at which all property, real and personal in the city of Detroit is assessed, is one-half or 50% of true cash value; and that therefore the proper assessment to be imposed upon the property amounts to $9,779,170."

### III. TRUE CASH VALUE.

All methods used to determine true cash value involve the exercise of judgment or decision-making. While it may seem that a sale which has occurred definitely fixes market price so as almost indisputably to determine true cash value, this is not necessarily the case, particularly if the property is unique and if there have been few sales. The testimony in this case shows that a great many considerations

enter into the determination of sales price—need of or ability to utilize the property, the calculation of potential income, actual income, age and physical condition, possible tax benefits or detriments, cost of money, and so on. Sales price, particularly a single sales price, is only one index of true cash value. *Twenty-Two Charlotte, Inc.,* v. *City of Detroit* (1940), 294 Mich 275, 283; *Moran* v. *Grosse Pointe Township, supra; Kingsford Chemical Company* v. *City of Kingsford, supra,* at 102, 103. In *Davidson* v. *City of Lansing* (1959), 356 Mich 697, 700, Justice KELLY wrote for a unanimous Court:

"The sale price paid by appellants was an item to be considered by the assessor, but is not of and by itself controlling."

If reproduction or replacement cost is used as the test, we are again met by uncertainties. No reconstruction or replacement of the property is contemplated. Consequently, pricing by competitive bids is lacking. Costs are often related to those of other structures thought to be within the same building-type classification. After a figure for cost has been selected, the next step is to determine the amount to be allowed for depreciation and for obsolescence, if any. Allowances for depreciation normally bear a relation to the remaining useful life of the building at the time of its construction. What the assigned useful life of a building should be may prove a debatable question. Two types of obsolescence may be considered by the assessor: functional obsolescence and economic obsolescence. The first covers loss of value due to inherent deficiencies within the property. The second is loss of value occasioned by outside forces. The measure of allowable obsolescence becomes a subjective determination. It can vary widely in the minds of individual assessors. All of these decisions, where the reproduction or replace-

ment cost method is used, demand the exercise of judgment.

Finally, the capitalization of income method will produce different results depending upon such decisions as whether to use actual income or projected income, the amount and make-up of the capitalization rate, et cetera.

In this case the taxpayer's expert, Mr. Luedders, used a capitalization rate of 9% after property taxes but before depreciation:

"Two reasons: one in the interest of conservatism and the other, there is a certain amount of pride of ownership in owning such a beautiful complex and such a prominent piece of property."

A shift of 1% either way would produce considerable variation in value, as will be seen hereafter.

True cash value should be based upon one or more of the recognized methods for its determination. The method or methods to be used is a matter for decision at the assessing level and, if supported by the record, will not be subject to judicial review. Review will be limited to "fraud, error of law or the adoption of wrong principles." In these assessment decisions, three levels of determination— (1) by the assessor, (2) by the board of review, and (3) by the State tax commission—must ordinarily suffice.

The commission's staff report indicates that the current reproduction cost of the Fisher-New Center buildings before depreciation or obsolescence amounts to $63,160,864. Excluding ornate construction, the current replacement cost amounts to $51,-062,475. The staff estimated that after depreciation and obsolescence the value of the buildings and improvements is $13,870,342. The land, parking lots, et cetera, brings the total estimated value of the Fisher-New Center properties to $19,558,348.

The average net income of the Fisher-New Center properties before depreciation and property taxes for the years 1960, 1961, and 1962, was $1,176,-314. The commission's appraiser estimated that the future net income should approximate $1,576,314. The appraisal presented on behalf of appellant shows the actual figures for 1963 and 1964 to have been $1,526,806 and $1,482,284, respectively, being net income before real estate taxes. The commission utilized a capitalization factor of 8.1%. Such capitalization factor, applied against the 1963 net income, would indicate a value in an amount approximating $18,850,000.

The appraisal offered on behalf of appellant also shows an estimated stabilized net income[5] before taxes of $1,623,500. If one were to capitalize by the commission's factor of 8.1% this stabilized net income before taxes, the capitalized true cash value of the Fisher-New Center properties would be $20,-043,210.

The gross income of the properties, according to appellant's appraisal for 1963 and 1964, was $3,531,-989 and $3,635,379, respectively. The State tax commission's staff report recites that:

"A gross income check for office buildings from Boeckh's Manual[6] indicates a gross income multiplier of 4 to 6."

Exhibit "M", offered by cross-appellant, recites:

"An analysis of sales of comparable property showed that such sales prices were at an average ratio of 5.6 times the gross income of these properties."

Multiplication of the gross income shown by appellant for 1964, approximating $3,600,000, by a mul-

---

[5] Stablized net income as it appears in the appraisal was identified as the projection of normal future income before depreciation.

[6] Boeckh's Manual of Appraisals (1963, E. H. Boeckh Associates, Inc., Washington, D. C.), p 991.

tiplier of 5.6 would indicate a true cash value of
$20,160,000. Projecting gross income of $3,500,000
for 1963 by a multiplier of 5.6 would produce a true
cash value of $19,600,000.

The determination of the State tax commission
with regard to the true cash value of taxpayer's
property is supported by the record. Appellant has
not demonstrated errors of law or the application of
wrong principles.

IV. GENERAL LEVEL OF PROPERTY ASSESSMENTS.

Appellant in its brief states:

"In its decision, State tax commission applied a
50% ratio of fair market value as the general level
of assessments in Detroit. At the hearing, the city
of Detroit denied that its assessments bore any
ratio to fair market values. The only testimony in
this regard was that furnished by appellant. Appel-
lant produced in evidence the 1963 State board of
equalization report; Detroit's 1963 auditor general's
report; the Wayne County supervisor's report; the
United States department of commerce study and
the testimony of a member of State tax commission's
staff. All of these reports, having official status,
disclosed that the general level of assessments in
Detroit for both real and personal property was
42.7%. Without any evidence from the city of
Detroit in opposition thereto, State tax commission
nevertheless found as a fact that the general level of
assessments in Detroit was 50%. Thus appellant
contends, this finding, too, was contrary to and total-
ly unsupported by the only lawful evidence before
State tax commission which established beyond ques-
tion that the general level of Detroit property assess-
ments was 42.7%."

The State tax commission found as follows:

"State tax commission studies of real property
indicate that real property in the city of Detroit was

assessed in the significant range of 38–52% of its true cash value as of the tax days in question. Studies of personal property assessment levels indicate that personalty was assessed at approximately 56% of its true cash value. The assessment level of all property, real and personal, in the city of Detroit for the tax years in question has been determined to approximate one-half or 50% of its true cash value. Thus, the tax commission has determined all assessment appeals during the years in question by application of 50% to the true cash value of the property."

The studies of the commission upon which it based its decision are not contained in appellant's appendix nor in the record certified to this Court. Appellee Michigan State tax commission took no action to identify these studies on the record at the hearing before it, nor did the commission print a separate appendix for the purpose of exhibiting the studies to this Court.

If we were convinced as to the nonexistence of the commission studies and if there were no evidence before us to support the 50% average assessment level, we would be obliged to hold that the commission committed an error of law since its decision would then be unsupported by any evidence.

The commission stated that it had "made available every shred of data and evidence contained in its records to both taxpayer and taxing authority." Apparently, it is the contention of appellant that, because the commission did not see fit specifically to order its studies to be made a part of the record when the hearing took place, there is no evidence to support its decision. Appellant has misconstrued the nature of the hearing afforded it by order of this Court. The purpose of that hearing, as decided in *Pavilion*, was to give the taxpayer an opportunity to challenge the validity of any studies, reports, or

findings of the commission's staff, and to cross-examine the persons preparing the same.

Commissioner Barr discussed the nature of the record at the close of the hearing and insisted that all files and records of the commission be a part of the record in this matter. It is evident from an examination of what took place at the hearing that the taxpayer was not misled as to the nature of the studies and that, as a matter of fact, the 50% level was assumed to be shown by such studies.

The staff report prepared by Robert Case was a part of the record and copies were in the hands of counsel during the hearing. The staff report, in commenting on the total projected average net income of the properties and the income capitalization rate, said "this assumes a 50% assessment level." Additionally, in the concluding paragraph, under the heading "District Supervisors Comments", this statement appears: "Our appraisal also assumes a 50% assessment level."

Taxpayer's counsel cross-examined Robert Case extensively concerning the contents of the report which he had prepared. In the course of that examination, the following occurred:

"*Q.* You use a figure of 2.6% for taxes in your report for real estate taxes. How is that 2.6 arrived at?

"*A.* As I recall the 2.6%[7] is arrived at by relating it to the 50% assessment level here in the city of Detroit. The supervisor, Mr. Nordbeck, might be more qualified to go into detail about that than I am.

"*Q.* In other words, you took the prevailing tax rate of about $53 a thousand and cut it in half *because of the prevailing assessment rate in the city of*

[7] The commission utilized a capitalization factor of 8.1%, being composed of a return on investment of 5.5% and an allowance for real estate taxes in the city of Detroit amounting to 2.6% of true cash value. (Footnote supplied; not a part of quoted text.)

*Detroit at about 50% of fair market value,* is that right? (Emphasis supplied.)

"*A.* As I recall, this is true.

"*Mr. Honigman:* That is all."

Witness George Turner, when asked to give his opinion as to the average level of property assessments in Detroit, answered that in the downtown area the newer buildings were assessed at close to 50%.

Henry Thomas confirmed his understanding of the 50% level of assessments in Detroit when he explained his percentage of allowance for city taxes:

"The 2.6 was in a comparative analysis situation that the assessment may average 50% in the city of Detroit—the rate was $52 roughly—

"*Q. (Interposing):* Per thousand of assessed value.

"*A. (Continuing):* —and that in a combined way would be the taxes under a rate of $52 under a basis of a 50% assessment.

"*Q.* In other words, you recognize in evaluating the tax liability on the property that the tax will be assessed at $52 to $53 per thousand *based on the assessed value which is approximately 50% of true cash value,* is that right? (Emphasis supplied.)

"*A.* That's correct.

"*Mr. Honigman:* That's all."

It is clear from the record before us that the taxpayer was not taken by surprise as to the assessment level which the tax commission might find to be in effect in Detroit. Instead of attempting to impeach the 50% level assumed in the commission staff report and as indicated by these witnesses, the taxpayer elected to offer competing evidence of a lower assessment level. If the commission elected to accept such competing evidence, it might do so. However, there being some evidence to support the determina-

tion of the commission, and the valuation of the tax-payer's property having been reduced to 50% in accordance with such determination, the taxpayer is not in a position to complain.

The better practice upon this appeal would have been to include the studies of the commission as a part of the record for consideration by this Court. If, because of their bulk, this was not feasible, the pertinent portions could be extracted and certified or their contents covered by stipulation. Initially, this was the responsibility of the appellant. The appellant having failed to make the studies a portion of the record, the commission cannot be excused for having neglected to do so.

## V. Uniform Mode of Assessment.

There remains to be determined the contention of Detroit upon its cross-appeal that the use of a uniform mode for assessment of all properties within the city was correct and that the commission erred in failing to affirm the city's determination of valuation by such method. We agree with the tax commission that a uniform approach to valuation does not always result in uniform assessment. See *In re Appeal of General Motors Corporation* (1965), 376 Mich 373, 378, footnote 1. While uniform approach may be desirable, it is not the ultimate goal of valuation. The ultimate goal is uniform true cash values. They are not necessarily achieved by a single uniform approach. As we have pointed out, reproduction or replacement cost less depreciation and obsolescence is subject to many variables. Even a slight variation in the percentage of depreciation or of obsolescence may produce a considerable difference in valuation. The percentage to be used is a matter of judgment. Consequently, there is no assurance that the use of a single uniform mode will achieve a uniform assess-

ment. Its use is not forbidden but such use should not foreclose other methods and approaches, depending upon the nature of the particular property, to achieve uniform assessment. With all approaches available for use and comparison of results, valuations of property for assessment purposes are more likely to reflect true cash values than will be the case if only a single mode is used.

ADDENDUM: There are many varieties of judicial review. Generally review has been tailored to what courts, legislatures, and constitutional conventions considered to be requisite to due process and the realities of particular situations. For instance, judicial review in workmen's compensation matters is so limited that findings of fact, in the absence of fraud, are conclusive. See article 6, § 28, Const 1963; CL 1948, § 413.12 (Stat Ann 1960 Rev § 17.186). In contrast to this, review of chancery matters is *de novo*, even in this Court.

I have set forth the reasons I construe the constitutional language to mean an admittedly limited *judicial* review of property tax assessments—a special kind of administrative proceeding that goes on year after year and that, statewide, involves hundreds of thousands of valuations—420,000 parcels of real estate and 65,000 personal property assessments in Detroit alone. The law was well established in this field before the 1961 Constitutional Convention. From the constitutional debates, it is clear the 1963 Constitution intends no departure from the previous law.

Justice SOURIS' opinion and mine serve to illustrate the practical difficulties involved if courts were to consider the weight of the evidence in these tax matters. In these opinions, there has been a review of the evidence in this single case. If such review were to be allowed as a matter of right, the finality which

is now largely reposed in the Michigan State tax commission would pass to the courts. Since the importance of assured revenue for the operation of State and local government was well understood, I do not believe the people, in adopting the 1963 Constitution, intended a kind of review that would defer finality for years as litigation progressed through the courts.

I do not disagree with Justice SOURIS that where a hearing has been demanded the commission or the commission's staff has the procedural responsibility of presenting its case on the record for scrutiny and testing by the taxpayer. This issue of adequate presentation was never properly resolved at the hearing in this case—the studies, reports, and other data as to level of assessments never were fully identified and ferretted out of the commission's files—either by the taxpayer or the commission. The commission insisted in a vague fashion that they were a part of the record. Neither the taxpayer nor the city of Detroit insisted upon specification of the same, as they had a right to do. While suggested techniques for coping with this problem have been stated in this opinion, whatever techniques may be necessary should be developed in future tax cases.

Affirmed. No costs, neither party having provided the Court with a satisfactory record.

KELLY, BLACK, T. M. KAVANAGH, and BRENNAN, JJ., concurred with ADAMS, J.

SOURIS, J. (dissenting). I do not agree with Mr. Justice ADAMS' opinion that if there be any evidence found in the record to support the findings of the State tax commission, that ends judicial review of the commission's proceedings for errors of law. The commission's proceedings, in my opinion, are sub-

ject to the same scope of judicial review provided by the administrative procedures act[1] for other administrative agencies. That act establishes, in subsection 8(6)(e) thereof, the quantum of evidence necessary to sustain an agency decision. The standard established is that agency findings, inferences, conclusions, or decisions must be supported by competent, material and substantial evidence. It is not enough that there is in the record some evidence, a scintilla, to sustain the agency's determination against an "errors of law" claim, as Justice Adams holds.

Applying the act's requirements to the record of proceedings before the State tax commission, I conclude that the commission's findings are not supported by competent, material, and substantial evidence and that they are contrary to the overwhelming weight of the evidence. Indeed, I conclude there is no competent evidence to support the commission's decision. Therefore, I conclude that the commission's decision based upon such unsupported findings constituted an error of law.

## I.

The second paragraph of article 6, § 28 of our Constitution of 1963 limits the scope of judicial review of such proceedings:

"In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decisions relating to valuation or allocation."

As I understand Justice Adams' opinion, he does not dispute the proposition that the sufficiency of

---

[1] CLS 1961, § 24.101 *et seq.* (Stat Ann 1961 Rev § 3.560 [21.1] *et seq.*).

evidence to support a tribunal's fact finding is a
question of law. In any event, in this State the suf-
ficiency of evidence is a question of law appropriate
to a reviewing court's consideration even when re-
view is by certiorari and, therefore, limited to errors
of law. This does not mean that the reviewing court
considers the evidence for the purpose of making
its own findings of fact, but only that the evidence
is examined to determine, as a matter of law, whether
it supports (by the standard set by law) the facts
found by the tribunal whose action is being reviewed.
In *Jones* v. *Eastern Michigan Motorbuses* (1939),
287 Mich 619, 643, Mr. Justice NORTH, writing for
six members of the Court, examined the issue at
length in the context of this Court's scope of review
of nonjury law cases under former Court Rule No
64 (1933) (pp 647, 648):

"Even when appeal in law cases was by the com-
mon-law writ of error, the long-established practice
in this jurisdiction permitted review of testimony
as to essential facts, if under such writ of error there
was an assignment that the finding or judgment of
the court was contrary to the clear or overwhelming
weight of evidence. CL 1929, § 14266 (Stat Ann §
27.995); *Kotzke* v. *Kotzke's Estate,* 205 Mich 184;
*Hamburger* v. *Bank of Detroit,* 218 Mich 173. Under
Court Rule No 64 (1933) in its review on appeal in
nonjury law cases this court does nothing more nor
less than to determine whether 'the judgment is
against the preponderance of the evidence', in event
such an assignment of error is urged. It is difficult
to conceive how this practice under the rule upon
appeal differs materially from the former practice of
this court upon issuance of its writ of error. This is
true notwithstanding decisions almost without num-
ber can be found wherein in substance it is stated
that the writ of error brings up for review only
questions of law, not questions of fact. * * *

"Under Court Rule No 64 (1933) it may be said that the determination by this court of whether 'the judgment is against the preponderance of the evidence' is a question of law rather than one of fact. This is true because, generally speaking, a judgment in a law case which is entered in favor of the party having the burden of proof, notwithstanding the preponderance of the evidence is to the contrary, is a judgment entered in violation of law."

In *Jerry McCarthy Highland Chevrolet Company, Inc.,* v. *Department of Revenue* (1958), 351 Mich 558, this Court considered the nature of judicial review of an administrative agency's decision in light of a statute which limited appeals to the circuit court to questions of law. Absent statutory authority to test administrative agency findings of fact on a great weight or similar standard, the Court concluded nonetheless that the evidence could be considered on review for errors of law to determine whether the record contained any competent evidence to support the facts found by the agency.

Article 6, section 28 of our Constitution does not specify the quantum of evidence necessary to sustain a finding of fact by agencies such as the State tax commission against a claim of error of law. Absent such specification in our Constitution or by statute, I would have to agree with Justice Adams, on the strength of *McCarthy, supra,* that the commission's decisions reviewed for errors of law would have to be sustained if there were any evidence, competent evidence, that is, in the record to support the findings of fact upon which the decisions were based. That is the very least that due process requires. *Dation* v. *Ford Motor Co.* (1946), 314 Mich 152.

However, I have concluded that the administrative procedures act is applicable to State tax commission proceedings, notwithstanding *Dossin's Food Products, Inc.* v. *State Tax Commission* (1960), 360

Mich 312, and that statute requires more than any
evidence to sustain findings of fact made by adminis-
trative agencies when subjected to judicial review.

It is true that a majority of this Court held in
*Dossin's, supra,* that the administrative procedures
act is not applicable to State tax commission pro-
ceedings.  The majority reached its conclusion by
finding conflict between the general property tax
act,[2] and the administrative procedures act, and by
reasoning that the general property tax act is a spe-
cific statute; that the subsequently enacted adminis-
trative procedures act is a general statute; and that
the repeal of a specific statute by a general statute
will not be implied or assumed.  At our invitation,
the parties hereto have submitted supplementary
briefs addressed to the issue whether *Dossin's* hold-
ing that the State tax commission is not subject to
the administrative procedures act should be over-
ruled.

The dissenting opinion in *Dossin's* continues to be
more persuasive to me than the majority view.  The
fact is that this Court has overruled *Dossin's sub
silentio,* in *In re Appeal of General Motors Corpo-
ration* (1965), 376 Mich 373, 382, in which the Court,
speaking through Justice ADAMS, unanimously ruled
that the State tax commission was bound by the
standards of proof provided by the administrative
procedures act and that on remand of that case
only such additional evidence should be considered
as would be competent under the authority of sec-
tion 5 of that act.  No one suggests that the commis-
sion may be subject to some, but not all, provisions
of that act.

The scope of judicial review of administrative
agency decisions provided by section 8 of the admin-

---

[2] PA 1893, No 206 (CL 1948, § 211.1 *et seq.* [Stat Ann 1960 Rev
§ 7.1 *et seq.*]).

istrative procedures act is not broader than the errors of law permitted by article 6, section 28 of our Constitution to be considered in reviewing State tax commission decisions. It does not seem to be disputed that the constitutional reference to "errors of law" is identical with the errors of law appropriate to consideration on review by certiorari. Mr. Justice Black, in dissent, in *Imlay Township Primary School District No. 5* v. *State Board of Education* (1960), 359 Mich 478, 489,[3] ably demonstrated that subsection 8(6) allows review only of questions of law, as on certiorari. He listed in the margin[4] of his opinion the specific limitations subsection 8(6) imposed upon judicial review and stated his conclusion that each item of authorized review presented a question of law. Pertinent to the case at bar is the following reasoning from Justice Black's opinion in support of his stated conclusion (pp 491–493):

"The appeal provided under section 8 is by petition. The petition, once it is filed and served and due return is made, brings up the administrative record as on certiorari issued by authority of section 2 of Court Rule No 43 (1945) (likewise author-

---

[3] The Court's majority in *Imlay* held that appeals from the State board of education were not subject to the administrative procedures act for very much the same reasons *Dossin's* majority later held the State tax commission's proceedings were not subject to the act. Justice Black, on the other hand, disagreed and, thus, turned to consideration of the nature of review provided by the act.

[4] "'(6) The [circuit] court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by competent, material, and substantial evidence in view of the entire record as submitted, or contrary to the overwhelming weight of the evidence; or

(f) Arbitrary or capricious.'"

ity of art 7, § 10, Const 1908) to review the allegedly grievous action of some 'corporate body or board or officers thereof.' As on certiorari issued under said section 2 the petition and returned administrative record bring to circuit no question of fact and authorize no determination, *de novo* or otherwise, of 'factual issues.' Listed in the margin are the specific limitations section 8(6) imposes upon judicial review. Each item of authorized review presents a question of law.

"Possibly my Brothers have assumed that subsection (e)—authorizing determination whether the questioned administrative decision is 'contrary to the overwhelming weight of the evidence'—authorizes judicial determination of an issue or issues of fact. If that were so I would share the concern voiced in Mr. Justice CARR's opinion. It is not so, however, and thus the alarm is false. Subsection (e) brings up questions of law only, it having been held—properly and with lengthily considered care—that the question whether there is any evidence of record supporting a finding of fact, or whether such finding is contrary to preponderance or (as here) 'overwhelming weight' of the evidence of record, presents a question of law and not of fact (*Jones* v. *Eastern Michigan Motorbuses,* 287 Mich 619; followed on this point in *Barnes* v. *Beck,* 348 Mich 286, 290). If such was not the law, a new and possibly unconstitutional task might have been cast upon the judiciary in every case where, by similar statute (section 38 of the employment security act is another example) the circuit court is called upon to determine whether an administrative decision satisfies the variously worded legal test of preponderant or overwhelming weight."

Thus, subsection 8(6)(e) of the act establishes a quantum of evidence standard to be considered upon judicial review for errors of law broader than the otherwise applicable "any evidence" rule of the *Mc-Carthy Case, supra.* The result is an error of law

if the commission's findings are "unsupported by competent, material, and substantial evidence in view of the entire record as submitted, or contrary to the overwhelming weight of the evidence." Lest anyone be alarmed that judges hereafter will assert a right to determine facts *de novo* in section 8 proceedings, we could adopt here that special "Thou shalt not" commandment Justice BLACK proposed[5] in his opinion in *Imlay, supra.*

## II.

Applying the administrative procedures act's quantum of evidence standard necessary to support agency decisions, I conclude that the State tax commission's decision was predicated upon findings of fact not supported by competent, material, and substantial evidence and that its findings were contrary to the overwhelming weight of the evidence presented. Furthermore, as I read this record, the commission's decision does not satisfy even the "any evidence" standard applied by Justice ADAMS. In short, I find no competent evidence to support the commission's decision of valuation and assessment.

The commission valued taxpayer's property on a capitalization of income basis. This clearly is demonstrated by the cross-examination of Robert Case, a commission appraiser, part of which is quoted in Justice ADAMS' opinion, *supra,* p 356. While it is true that calculations were made of the reproduction cost of the property, it is crystal clear from Mr. Case's testimony and, as well, from the written decision of the commission, also quoted in Justice

---

[5] "Of course, if my Brothers are yet queasy or uneasy about judicial intentions below, they could insert a special 'Thou shalt not' commandment in their opinion of concern; a general order that no circuit judge engaged in reviewing an administrative record under said section 8 may decide or determine anything aside from a point or points of law presented under said section 8, subd (6)."

ADAMS' opinion, that the commission relied upon its capitalization of income calculations. In the written decision, reference is made to the reproduction cost appraisal merely as substantiation of the capitalization of income appraisal. But the commission's own records and its witness' testimony dispute the claimed substantiation. Its staff report discloses that taxpayer's land was appraised at $5,688,-006 and its buildings, on a current reproduction cost basis before depreciation and obsolescence, at $51,-742,222. Mr. Case testified, on cross-examination by taxpayer's counsel, that the reproduction cost was reduced by 50% for depreciation and that the resulting amount was reduced further by 50% for obsolescence. The 50% obsolescence factor was selected, rather than 40% or 60%, for example, in order to bring the reproduction cost figure down to the value previously determined on a capitalization of income basis. His testimony concerning the justification for the 50% obsolescence factor destroys any basis whatever for the commission's claim that its computation of reproduction cost less depreciation and obsolescence "substantiated" its valuation by capitalization of income. The pertinent portions of that testimony are set forth in the margin.[6]

---

[6] "Q. [Mr. Honigman] Now, where is the amount that you have taken off for obsolescence, have you got any breakdown of that?
"A. [Mr. Case] The obsolescence factor in the report refers to 50% obsolescence in addition to a 2% per year rate of depreciation.
"Q. How did you arrive at the 50% obsolescence factor?
"A. From the income projections that we made to the value of the property to bring it down to the indicated current market value on the basis of the income projections that we made. * * *
"Q. Now, how is that done, will you explain that to me? What do you mean by 50%? 50% of what? Of the replacement cost?
"A. That's correct, the depreciated replacement cost.
"Q. So first you figure the replacement cost, then you took a depreciation factor of what percentage, do you recall? * * *
"Q. So therefore as a matter of personal judgment you decided that 50% would be a sound depreciation factor?
"A. For this building, yes.

That means that the commission's decision, if it is to be sustained from its own computations of value, must find evidentiary support from its capitalization of income appraisal and not from its reproduction cost appraisal. Mr. Case prepared the commission's appraisal of value by capitalization of income. As far as the record before us discloses, only one other commission employee, David Riser, worked with Mr. Case on the capitalization of earnings appraisal, and he was not called as a witness. The

"*Q.* And then how did you arrive at the 50% for obsolescence, explain it.

"*A.* We arrived at the 50% obsolescence by taking the reduction in value necessary to bring it down to the income approach on the value of the property.

"*Q.* So in other words, using the income approach basis you arrived at a value that was less than the reproduction cost less depreciation, is that right?

"*A.* Considerably so.

"*Q.* How much was that valuation less than the reproduction cost less depreciation? * * *

"*A.* $51,000,000.

"*Q.* $51,000,000 and then after depreciation you say you took off 50% as a matter of judgment, that got you down to $26,000,000, is that right?

"*A.* Well, the figures I am quoting to you relate—include both the depreciation rate applied and the obsolescence factor applied to reduce the replacement cost figure of $51,000,000 down to the figure used of $13,870,000.

"*Q.* I understand that but I am trying to arrive—I am trying to demonstrate how you arrived at it, so if you will just listen to the questions we will get to the same answer. First, you divided the $51,742,000 in half, is that right? To get the depreciation?

"*A.* That was the depreciation deduction, correct.

"*Q.* And that gets you close to $26,000,000, is that right?

"*A.* Approximately.

"*Q.* All right. Then you cut that down by half again as an obsolescence factor to get the $13,870,000?

"*A.* That's correct.

"*Q.* Now, what caused you to take the 50% figure for obsolescence?

"*A.* Well, in order for us to bring our appraisal down to the value that we arrived at from projecting the income of the property it was necessary to apply that amount of obsolescence to bring it down to that range.

"*Q.* Well, why was it necessary to use 50% instead of 40 or 60?

"*A.* Well, if we used 40 or 60 then we would not be in correlation with our income projections as to the value of the property."

appraisal, therefore, must stand or fall on the testimony offered by Mr. Case in its support. His testimony discloses that the report was based upon assumed facts, essential to its conclusion, for which there is no evidentiary support in this record and, therefore, that the commission's adoption of its valuation conclusion as its own decision was an error of law requiring judicial reversal.

Justice ADAMS notes that all methods for determining true cash value, including capitalization of earnings, require the exercise of judgment. Decisions based upon hunches, conjecture, factually unsupported assumptions, hardly can be described fairly as the exercise of judgment. Opinions or conclusions normally are not considered competent evidence unless they relate to matters beyond the ken of the fact finder, unless they are offered in the form of the opinion of an expert, and unless the factual basis for the expert's opinion is supported in all essential respects by some evidence. This is not a matter of credibility; it is a matter of competence and, therefore, goes to the admissibility of the opinion evidence for any purpose.

Here, Mr. Case disavowed any pretense to expertise in the field of valuation by capitalization of earnings. His disavowal was more than a reluctance based upon false modesty to assert expertise; he affirmatively denied he was an expert.[7]  Whatever

---

[7] "*Q.* Mr. Case, in the preparation of your report you purported to be an expert on valuation on the capitalization of income method, did you not?

"*Mr. Pliskow* [*counsel for the city*]: I will object to that, I don't think Mr. Case ever said that he was an expert in any field, he was an employee of the State tax commission.

"*Mr. Honigman:* I want to know whether he is an expert or not, we are going to find out right now.

"*Mr. Pliskow:* You tried to make an expert of him.

"*Mr. Honigman:* He is going to have to make the claim himself, one way or the other. I don't care which it is.

"*A.* There are all kinds of definitions of expert but .I think I

his familiarity with appraisal procedures and man-
uals, his own testimony supports his disclaimer of
expertise.  Therefore, the commission's staff report,
of which he claimed authorship, because it is in its
essential form an expression of opinion, of judg-
ment, should not have been admitted in evidence
and adopted by the commission as its own decision.

Even if we assume Mr. Case's qualifications to
offer opinion testimony, the underlying assumptions
upon which his opinion is based are not supported by
facts in this record.  For example Mr. Case testified
that he used a 5.5% rate of return as the base rate
for capitalizing earnings to determine the value of
taxpayer's property.  He admitted that the rate
selected does not represent the average rate of re-
turn expected by a prudent investor in real estate;
that he did not know of any sales of investment real
estate made on the basis of a 5.5% rate of return;[8]

---

have a number of years to go in the appraisal field before I will
qualify as an expert.

"Q. So in your opinion, you are not expert on a capitalization
of income method?

"A. Not an expert, no.

"Q. And your testimony would not—could not be qualified as
expert testimony for that purpose?

"A. I would say no."

[8] Mr. Case's cross-examination on this point reveals devastatingly
the absence of any foundation for his use of the 5.5% prime money
rate for capitalizing earnings on a real estate investment.  It also
reveals that the very appraisal manual he purported to use supports
taxpayer's evidence that the capitalization rate used should have
been between 7% and 10%:

"Q. Do you know of any sales of investment real estate made on
the basis of a 5.5% return?

"A. I haven't been involved in the sales of any property.

"Q. Do you know of any? Just answer the question.

"A. No.

"Q. All right.  Do you know what the prevailing rate of re-
turn from real estate investments in this type of property was
during the time that you were making this appraisal?  Will you
answer yes or no.  You either do or don't know, Mr. Case.

"A. I would say yes.

"Q. You do know what was the prevailing rate of return on
investment real estate property at that time?

"A. You are talking about overall rate?

that it was, instead, the average rate then expected
"in a prime return situation where there is very
little risk involved in the investment of money.

---

"*Q.* Well, the word prevailing means the typical rate of return
for this type of property expected by investors at this time, at the
time you were making the appraisal.

"*A.* Well, this rate varies considerably depending upon the
property itself.

"*Q.* What was the range of variance?

"*A.* I would say for an office structure between—depending upon
what the situation is with the property—between 6 and 8%.

"*Q.* All right, then it is not 5.5%? 5.5%, you want to change
now to 6 to 8, is that right?

"*A.* No, I am not going to change it. You asked me for a range
and I gave it. I could just as well have said 5.5% to 8% depend-
ing upon the risk involved.

"*Q.* Do you know of any property that was bought at 5.5%
during the period that you are talking of?

"*A.* No.

"*Q.* Do you know of any that was bought at 6%?

"*A.* No.

"*Q.* Or 7%? Do you know of any that was bought at 8%?

"*A.* No.

"*Q.* Do you know of any that was bought at 9%?

"*A.* No.

"*Q.* Do you know of any that was bought at 10%?

"*A.* No.

"*Q.* Do you know of any that was bought at 15%?

"*A.* No.

"*Q.* So you don't know of any sales of investment property and
what investment return they showed in that general period?

"*A.* Well, we used as—

"*Q.* *(Interposing):* Just answer that, do you or don't you? Yes
or not. You either do or you don't.

"*A.* We took other comparable buildings into consideration and
the sale of those buildings into consideration in this report.

"*Q.* Fine. Now, do you know of any buildings that you took
into consideration?

"*A.* I would have to refer to my list in my report.

"*Q.* Will you take a look at the list in your report and tell
us if you took any buildings into consideration?

"*A.* We listed 4 other buildings here that we had taken a look
at the selling price: One was the Penobscot building, the other one
was the United Artists building, Maccabees building and the First
National building.

"*Q.* All right. Do you know what rate of return was shown on
each of these buildings?

"*A.* At the time of their sale and at the time I did this appraisal
the rate of return, no it is not included in my report, I wouldn't
recall it.

"*Q.* So that at no time did you know what the prevailing in-
vestment expectancy was at the time you were making your ap-
praisal?

\* \* \* It takes into consideration all over invest-
ments, types of investments like blue chip stocks
and municipal bonds and et cetera, et cetera, where
money can be returned on a basis of its investment
with very little risk involved in gaining this return."

The *only* evidence in this record of the rate of re-
turn a prudent real estate investor in the Detroit
area normally expected came from William R. Lued-
ders, taxpayer's expert witness, whose qualifications
were conceded. Evidence was introduced through
him of comparable contemporaneous actual real es-
tate investments in and near Detroit at rates of re-
turn from 8.8% to 10.7%, free and clear net, that is,
*after* property taxes but before depreciation.[9] Mr.
Luedders testified that in computing his valuation
of taxpayer's property by capitalizing earnings, he
used a 9% free and clear net rate, stating that in his
opinion it was a conservative rate of return.

---

"*A.* I would say only from our appraisal manuals that are avail-
able and I don't recall ferreting out the rate of return on each in-
dividual building that we have included here in the report.

"*Q.* Do you know what manuals you used in checking for pre-
vailing rates for capitalization of income method?

"*A.* Well, we used Boeckh's Appraisal Manual and Marshall Stevens.

"*Q.* What do you know what figure Boeckh's uses?

"*A.* For?

"*Q.* For an office building of this type.

"*A.* As I recall it ranges between 6 and 8%.

"*Mr. Honigman:* Get Boeckh's Manual.

"*Chairman Barr:* We will take a 5-minute break for the girl.

"(*Hearing recessed at 11:30 o'clock a.m.*)

"*After Recess*

"*Q. (By Mr. Honigman):* Let me show you, Mr. Case, Boeckh's
Manual, page 998, what percentage return does that show for this
type of property?

"(*extending manual to witness*)

"*A.* For modern office buildings centrally located, well located high
class, they show a range of office buildings of 6 to 10%.

"*Q.* And then it says 'older office buildings'?

"*A.* Older office buildings well located—7 to 10 %."

9 The sales considered included the David Whitney building, Gris-
wold building, First National building, Lafayette building, Book
building, United Artists building, and the Francis Palms building,
all in Detroit; Pittsfield Village in Ann Arbor; and Federal de-
partment store in Ferndale. The sales occurred between 1957 and
1965 and ranged in sales price from $715,000 to $11,750,000.

The proper rate of return for capitalization pur-
poses is the only disputed issue between taxpayer
and the commission. They are practically in agree-
ment on the only other element in the capitalization
formula—the estimated earnings of the property be-
fore real estate taxes, the commission's estimate be-
ing almost $50,000 *less* than the taxpayer's. But
the difference between 5.5% and 9% represents the
difference in value between $19,460,667 and $13,588,-
913, using Mr. Case's estimate of earnings before
property taxes and an allowance of 2.6% he added to
the prime rate to compensate for property taxes.[10]

Absent any evidence to support use of Mr. Case's
5.5% factor for capitalizing earnings on real estate
investments,[11] I conclude that the commission com-

---

[10] Because investments in real estate carry the burden of property
taxes not payable on other investments, an allowance has to be made
for such additional determinable expense item. Accordingly, Mr.
Case added to his 5.5% prime money rate factor 2.6% as an allow-
ance for property taxes, thus bringing up to 8.1% the factor to
be applied to estimated earnings *before* property taxes. The al-
lowance was correctly made in light of evidence that the prevailing
tax rate was $53 per thousand of assessed value and assessments
were averaging 50% of true cash value. Mr. Luedders, on the
other hand, deducted from his estimate of earnings the taxes actually
*imposed* by the city and to the resulting net earnings *after* property
taxes, he applied his 9% free and clear net rate to determine value.
However, the city taxes actually imposed were based upon the city's
inflated assessment which precipitated this litigation. To simplify
matters for comparison purposes, we may use Mr. Case's estimate
of earnings *before* property taxes and his 2.6% allowance for such
taxes added to Mr. Luedder's 9% capitalization rate. The computa-
tions may be expressed thus:

$$\frac{100 \ (\$1,576,314 - \text{True Cash Value} \times .026)}{5.5} = \$19,460,667$$

$$\frac{100 \ (\$1,576,314 - \text{True Cash Value} \times .026)}{9} = \$13,588,913$$

[11] The commission's staff report prepared by Mr. Case has ap-
pended its district supervisors' comments. They merit quotation in
full for the light they cast, even within the commission, upon the
use of a 5.5% prime money rate in appraisal of this property:

"District Supervisors ['] Comments: The appraisal is primarily
an income approach. The Cap. rate of 5-1/2% is rather low and
it is doubtful if this building could be sold for this even con-

mitted an error of law in using it. The only compe-
tent evidence put the rate between 8.8% and 10.7%
free and clear net. I would, therefore, reverse the
commission's decision and remand for the purpose
of recomputing the valuation and assessment of tax-
payer's property at a capitalization rate within that
range in accordaance with the procedures described
herein.

## III.

I do not disgree with Justice ADAMS' conclusion
that there was sufficient evidence to support the
commission's determination that assessments in
1963, 1964 and 1965 were at about 50% of true cash
value. Some of the evidence, indeed, was elicited
during cross-examination by taxpayer's counsel.
That taxpayer offered strong evidence that the ratio
was much lower does not merit reversal on this point,
not because there was some evidence to support the
commission's finding but, rather, because we cannot
say that it was contrary to the overwhelming weight
of the evidence.

I do not agree with Justice ADAMS' suggestion,
however, that we can consider the commission's
claim that studies not a part of this record support
its finding. If not made a part of the record of the
commission's hearing, they may not be used by the
commission or by us. Nor do I believe it to be the
taxpayer's burden to ferret out of the commission's
files all of the studies, reports, and other data that
the commission conceivably might rely upon in

---

sidering the benefits of depreciation. There is a possibility that the
income can be increased over the $400,000 that we projected. Our
appraisal also assumes a 50% assessment level. In this case a
$3,500,000 reduction. It is extremely speculative that the net in-
come could be increased to the $700,000 necessary to allow a yield
on this of 7% which would give a 10% equity return plus the
benefits of depreciation."

reaching its decision. In proceedings before the
State tax commission, a taxpayer has a difficult
enough time as it is putting in his own case, rebutting
the taxing municipality's case and, as well, attack-
ing the weaknesses in an adverse report of the
State tax commission's staff. See *Pavilion Apart-
ments, Inc.,* v. *State Tax Commission* (1964), 373
Mich 601. The shoe is on the other foot, and just
as binding, when the taxing municipality is defend-
ing its assessment against a taxpayer's objections
and a report of the State tax commission's staff ad-
verse to it. This situation arises, as it does in some
other administrative agency proceedings, because
the contest sometimes is a tripartite one between
the taxpayer, the taxing municipality and the com-
mission's own staff. It is exacerbated by the fact
that the commission's staff position in the dispute
is not presented formally at the hearing by it or in
its behalf by counsel but, rather, normally is elicited
by the taxpayer or city whose position it supports.
When the commission's staff report supports neither
of the principal contestants, as in this case of Fisher,
absent an adversary presentation by the staff itself
or on its behalf by counsel, it seems to me quite un-
realistic to place the burden upon either of them to
introduce in evidence all of the underlying data sup-
porting the adverse staff report. In such circum-
stances, if the State's interests are to be protected
adequately and our concepts of due process not dis-
torted, the commission's staff must be represented
actively as a party to the proceedings by counsel.

At the very least, however, if the commission's
staff is not represented at the hearing, the burden
of introducing its report and supporting evidence,
when in conflict with both of the principal contest-
ants, should be placed squarely upon the commission.
I thought we had decided in *Pavilion, supra,* that

administrative agencies, specifically this very commission, were not entitled to "stray at will from the record in reaching [their] decision". *Mazza* v. *Cavicchia* (1954), 15 NJ 498, 514 (105 A2d 545, 554), quoted in *Pavilion, supra.* Unless *Pavilion* means that the administrative agency must introduce formally in evidence all documentary and testimonial facts it intends to rely upon in making its decision, it means nothing of value to taxpayers or to taxing authorities. If it does not mean that, the taxpayer or taxing municipality must then ferret out of the agency's files, if they can, every scrap of paper and other evidence the agency conceivably might use, even evidence adverse to their own claims, so that they can "challenge the validity of any studies, reports or findings of the commission's staff, and  *  *  *  cross-examine the persons preparing the same," in the words of Justice Adams, *supra*— even if they have no way of knowing then how the commission might in the future make use of the data found in reaching its decision! If that is what our decision in *Pavilion* means, it was a Pyrrhic victory for the taxpayer.

I would hold in this case that the commission, having failed to introduce in evidence its staff studies of assessment levels, was not entitled to consider them in reaching its decision.

## IV.

I agree with Justice Adams' opinion regarding the city of Detroit's cross-appeal.

For the reasons set forth above, I would reverse and remand for the purpose of recomputing the valuation and assessment of taxpayer's property at a capitalization rate within the range established by the competent evidence in this record as discussed

in Part II of this opinion. I would also assess costs in favor of the taxpayer.

DETHMERS, C. J., and O'HARA, J., concurred with SOURIS, J.

BLACK, J. (*concurring*). Without reservation I agree with the comment and reasoning Justice Souris has written in paragraphs 6 through 9 of his opinion for reversal. But the trouble is that a majority of the Court did not agree with us in the *Dossin's Food Products Case* (360 Mich 312) and still does not agree with our view that the State tax commission is an "agency" within section 1(1) of the administrative procedures act (CLS 1961, § 24.101 *et seq.* [Stat Ann 1961 Rev § 3.560(21.1)]).

In this Court two unsuccessful attempts at persuasion are enough. Better to lie in wait as more ammunition pours in. Resignedly, therefore, I have indorsed the opinion of Justice ADAMS as a correct application of the constitutional provision (art 6, § 28, Const 1963) and of our current rule which restricts judicial review of orders and decisions of the State tax commission.